Eduardo H. Coronado, SBN 022397
**CORONADO LAW FIRM, P.L.L.C.**
4700 W. White Mountain Boulevard
Lakeside, Arizona  85929
Telephone:    (928) 532-4529
Fax :           (928) 532-0753
Email:        eduardocoronado@frontier.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| **Grady Hillis, Grady Hillis Realty, and GLH Property Investments, LLC,** | **Case No.:** |
| **Plaintiffs,** | **Complaint** |
| **vs.** | |
| **National Association of Realtors, Arizona Association of Realtors, a Domestic Nonprofit Corporatoin, Arizona Realtors, White Mountain Association of Realtors, A domestic Nonprofit Corporation, Financial Business Solutions, LLC, a Domestic Limited Liability Company, aka FBS, FLEXMLS®, SUPRA®; John Does I-V; Jane Does I-V; ABC Corporations I-V; and XYZ Partnerships I-V,** | |
| **Defendants.** | |

1. Plaintiffs, **GRADY HILLIS, GRADY HILLIS REALTY, and GLH PROPERTY INVESTMENTS LLC**, (hereinafter "Plaintiffs"), by and through their undersigned counsel, for their Complaint, allege as follows:

## PARTIES, JURISDICTION AND VENUE

**2.** Plaintiff,  Grady Hillis, is a resident of Lakeside, (Navajo County), Arizona and a licensed real estate broker and investor in Arizona conducting a real estate brokerage investment business primarily in Navajo, Apache and occasionally, Maricopa County, Arizona and has been licensed as a real estate agent or broker in Arizona for approximately 23 years.  This Plaintiff was damaged by the actions of the Defendant(s) both as a real estate broker and as an investor, seller and buyer employing other real estate brokers and agents for their services.  These services were damaged, hindered or infringed upon by the actions of the Defendant(s) causing damage to the Plaintiff(s).

3.  Plaintiff,  Grady Hillis Realty, is Plaintiff, Grady Hillis' real estate brokerage, licensed in Arizona(Navajo County), conducting a real estate brokerage and investment business primarily in Navajo, Apache and occasionally, Maricopa County, Arizona for over 10 years.  These services were hindered or infringed upon by the actions of the Defendant(s) causing damage to the Plaintiff(s).

4.  Plaintiff,  GLH Property Investments LLC is Plaintiff, Grady Hillis' real estate investment company formed as an Limited Liability Company in Arizona.  Plaintiff, Grady Hillis, is the sole owner and managing member of this LLC. The actions of the Plaintiff(s) were damaged, hindered or infringed upon by the actions of the Defendant(s) causing damage to the Plaintiff(s).

5.  Defendants, NATIONAL ASSOCIATION OF REALTORS (hereinafter NAR) "is a trade association organized under the laws of Illinois with its principal place of

business in Chicago. It is the leading national trade association of real estate

brokers and agents.  Among its members are licensed residential real estate

brokers (and agents) (Emphasis added), including brokers who provide real estate

brokerage services to home sellers ('listing brokers"), home buyers ("buyer

brokers"), or both (collectively "residential brokers"). It inclues its successors and

assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint

ventures, and their directors, officers, managers, agents, and employees .[1]  It is

---

On July 1, 2021 the DOJ filed a Notice of Withdrawl of Consent to Entry of Proposed Final Judgment and a Notice of Consent to Entry of Proposed Final Judgment. This is the definition the United States Department of Justice (DOJ) used to describe NAR in its case against NAR filed in the United States District Court for the District of Columbia on November 19, 2020 Case number 1:20-cv-3356 for antitrust violations that "collectively unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and should be enjoined."
The DOJ further alleged that NAR "has adopted a series of rules, policies and practices governing, among other things, the publication and marketing of real estate, real estate broker commissions, as well as real estate broker access to lockboxes, that have been widely adopted by NAR's members resulting in a lessening of competition among real estate brokers to the detriment of American home buyers.  These NAR rules, policies and practices include:…prohibiting NAR-affiliated multiple-listing services ("MLSs") from disclosing to prospective buyers the amount of commission that the buyer broker will earn…allowing buyer brokers to **MISREPRESENT** (emphasis added) that a buyers broker's services are free…..and limiting access to the lockboxes that provide licensed brokers with physical access to a home that is for sale to only brokers who are members of a NAR-affiliated MLS."
(Note: In Arizona this also includes the real estate agents that work as independent contractors for brokers and are paid by brokers.)
The depth of the reach of NAR's infringement was described on page 3 paragraph 7 of the DOJ's complaint which states "…NAR establishes and enforces rules, polices and practices that are adopted by NAR's 1400+ local associations (also called "Member Boards") and their affiliated MLSs that govern the conduct of NAR's approximately 1.4 million-member REALTORS® who are engaged in residential real estate brokerages across the United States."
The DOJ illustrates how NAR controls its Member Boards (and the brokers and agents that are associated with the Member Board) by citing the NAR Code of Ethics on page 3 paragraph 7 of the complaint which states "(a)ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association." (Citation omitted).
Filed with the complaint on the same day was a 16 page Proposed Final Judgment that listed numerous meausures that NAR would be ordered to take to remedy the alleged Antitrust violations as well as a 3 page United States Explanation of Consent Decree Procedures under page 2 paragraph 5 the DOJ reserved the right to withdraw the Proposed Final Judgment.
On December 10, 2020 the DOJ filed a 22 page Competitive Impact Statement that paroted much of the information from the previous pleadings.
On f Voluntary Dismissal.  In these two short documents the DOJ stated "After filing the Complaint and proposed Final Judgment, the United States sought Defendant's consent to amend the Reservation of Rights provision in Section XI of the proposed Final Judgment to eliminate any potential limitiation of the future ability of the United States to investigate and challenge additional potential antitrust violations committed by Defendant.  Defendant declined to consent.  As a result, the United States has chosen to exercise its right under Paragraph 2 of the Sipulation and order to withdraw its consent to entry of the proposed Final Judgment." In the Notice of Voluntary Dismissal, the DOJ asked the Court to dismiss the matter without prejudice.

the parent company that controls all or most of the actions of the Arizona Association of Realtors (hereinafter AAR)[2] and Arizona Realtors (hereinafter AR).

6. Defendants, AAR is a trade association held as a non-profit corporation that is a subsidiary or division of NAR with its headquarters in Phoenix, Arizona, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

7. Defendants, AR is a grievance committee that is a subsidiary or division of NAR and AAR with its headquarters in Phoenix, Arizona, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

---

On the same day, the DOJ issued a statement which stated, among other things, "(t)he department determined that the settlement will not adequately protect the department's rights to investigate other conduct by Nar that could impact competition on the real estate market and may harm home sellers and home buyers. The department is taking this action to permit a broader investigation of NAR's rules and conduct to proceed without restriction."
It appears that a Texas based real estate brokerage also filed suit recently in the Seattle District Court against NAR alleging antitrust violations. The merits of this case are not known and may be determined during discovery.(See March 9, 2021 Real Estate Seattle Times Article). All of the documents discussed in this footnote are attached collectively as Exhibit 1 in the order discussed.

[2]See 2019 Bylaws of NAR attached as Exhibit 2. It is a 20 page document. Article 1 Section 1 refers to local boards being referred to as Member Boards. The Member Boards relevant in this case are AAR and subsequenty AR, AAR's grievance committee both described above. WMAR is described in paragraph 8 and is a member board that is subordinate to AAR and, therefore, subordinate to NAR. See also Article IV Section 1 of the NAR Code of Ethics which requires all Member Boards to adopt the NAR Code of Ethics. See also the 2018 AAR Bylaws, Policies and Official Statements attached as Exhibit 3. Article XIII of this 24 page document states that AAR may discipline members for violating the code of ethics. See also the 2020 WMAR Bylaws and (sic) Rules and Regulations attached at Exhibit 4. Article VI Section 2 of this 17 page document states in part: "Any member of the Association may be reprimanded, fined, place (sic) on probation, suspended, or expelled by the Board of Directors for a violation of these Bylaws and (sic) Association Rules and Regulations…". The documents in Exhibits 2 through 4 were the only versions available at the time of this writing. Plaintiff's believe that they have not substantially changed in years but will address the issues with the Court after discovery if it is determined that other versions will make a relevant difference to the causes of action in this complaint.

8. Defendants, WHITE MOUNTAIN ASSOCIATION OF REALTORS (hereinafter WMAR) is a trade association that is a subsidiary or division of NAR and AAR with its headquarters in Lakeside, Arizona, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

9. Defendants Lipson, Nielson Cole, Selzer, Garin P.C. is an Arizona Law Firm that represented, and may still represent WMAR and possibly some of the other Defendants in this case its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

10. Defendant, Dax R. Watson, is a licensed attorney that is or has been employed by Defendants, Lipson, Nielson, Cole, Selzer, Garin P.C and his successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

11. Defendants, Financial Business Solutions AKA FBS (hereinafter FBS) is the creator of FLEXMLS® (hereinafter FLEX) which is a collaborative Multiple Listing Service used by almost 200 real estate markets worldwide with headquarters in Fargo, North Dakota, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

12. Defendants, FLEX is the collaborative Multiple Listing Service created by FBS and used by almost 200 real estate markets worldwide with headquarters in Fargo, North Dakota, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.[3]

13. Defendants, "Supra is a leading global provider of key management solutions. Supra released its first lockbox system in 1955 for the real estate industry. The Supra real estate lock box system is managed today by real estate associations (like NAR, AAR and WMAR) (Emphasis added) and multiple listing services for real estate agents (and brokers) (Emphasis added) to efficiently market and show listed homes." Their headquarters are 4001 Fairview Industrial Dr. SE Salem,Oregon 97302 and includes its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.[4]

---

[3] On information and belief FBS and FLEX are contracted with either NAR, AAR and/or WMAR to provide MLS services to real estate brokers and agents. The MLS information is automatically redacted when sent to real estate clients. This violates Arizona State Law, Arizona Administrative Code, State and Federal Antitrust Statutes, and the First Ammendment and Interstate Commerce Clause of the United States Constitution. These matters will be discussed in further detail later in the complaint. It is likely that FBS and FLEX are merely acting at the direction of NAR, AAR and/or WMAR and it may be that only injunctive relief is sought from FBS and/or FLEX depending on any information found through additional discovery or any cross claim they may file against the other Defendants. (See information found about FBS and FLEX found on the Web collectively attached as Exhibit 5).

[4] This information was obtained from Supra's website. Supra's lockboxes limit acces to the lockboxes to only members of a particular association and not all Arizona real estate brokers and/or agents and people authorized by the broker, agent or seller. Further, this lockbox is required by the WMAR rules and, likely, the AAR rules and NAR rules. the It is likely Supra is contracted with NAR, AAR and/or WMAR and is operating under the direction of one of the other Defendants. This violates Arizona State Law, Arizona Administrative Code, State and Federal Antitrust Statutes, and the First Ammendment and Interstate Commerce Clause of the United States Constitution. These matters will be discussed in further detail later in the complaint. It is likely that Supra is merely acting at the direction of NAR, AAR and/or WMAR and it may be that only injunctive relief is sought from Supra depending on any information found through additional discovery or any cross claim they may file against the other Defendants.

**RELEVANT HISTORY**

14. For nearly two decades the Defendants have infringed on the rights and duties as of the Plaintiff(s) as a real estate broker, real estate investor and client of the Defendant(s).

15. In approximately 2005, Defendant(s) began redacting information out of Plaintiff's sales listings when an emailed copy was sent to a potential buyer.  This also occurs with all other listings dessemenated by other brokers and agents who are members of WMAR.  There is no way for a broker or agent to override this.  The primary information redacted is the agent and or broker information.  This makes all listings appear to be the broker or agents listing that sends it and tends to reduce competition and infringes on advertising.  This practice has occurred for at least the past 16 years.

16. Further, the Defendants has adopted rules that do not allow for the disclosure of personal broker or agent information in the public remarks of listings including, but not limited to, names, phone numbers, social media accounts.  In practice, this also includes information a broker or agent has about their financial interest in a property.  Further, these rules limit engaging in transactions to only brokers and agents who are members of the MLS instead of all brokers and agents licensed in Arizona. These rules even prohibit an owner/seller of their home from placing their own for sale sign on their property.  This chills competition, restricts the ability of an agent or broker to get new buyers or sellers and misrepresents to potential buyers an agent or broker's financial interest.  There are extreme sanctions for failing to

1    follow these rules (including a $15,000.00 fine and/or expulsion) and, ultimately, it

2    is referred to AAR to impose the discipline.[5]

3

4    17. The Defendants also require the use of their approved lockbox on homes (Supra)

5    that are for sale to be used to access the keys for homes.  The Defendants also

6    limit who can use the lockboxes to only members of WMAR.  This eliminates the

7    ability for the rest of the brokers and agents in Arizona from having easy access to

8

---

[5] The WMAR Rules and Regulations of the Multiple Listing Service (hereinafter MLS Rules) is a 37 page document attached as Exhibit 6.  The first 24 pages focuses on advertising rules and the next 3 pages focus on lockboxes.  The first 27 pages is what is most relevant to this complaint and should be read in its entirety.  Section 1.1 says "(WMAR) shall maintain for the use of its Members a Multiple Listing Service ("MLS"…) which shall be subject to the Bylaws of the Association and such Rules and Regulations ("Rules") as may be hereinafter adopted." Of most importance here is Section 2.22 which states: **"Public Remarks Information.**  Information in the Public Remarks field shall be limited to information describing or marketing the listed property.  Field (sic) shall not include information about the listing agent or brokerage, including, but not limited to: names, phone numbers, websites, social media accounts, or any other means of directing  a prospective buyer to the listing agent or office…If violated, fines per the Rate & Fee Schedule are applicable. (Amended 05/2015)". Further, Section 2.35 states "[t]he MLS shall have the authority to remove from the MLS system, any listing violations as defined in Article II."  Section 5.1 does not allow brokers or agents to distribute listings to all other brokers or agents that are licensed in Airzona.  It limits the listings to only members of WMAR and states "**Section 5.1 Information for Participants Only.**  Any listing filed with the Service shall not be made available to any broker or firm not a Member of the MLS without the prior consent of the listing broker".  Section 5.2 resticts the ability of the client/seller to place their own for sale sign on their home and states: "**Section 5.2 "For Sale" signs.**  Only the "For Sale" signs of the listing broker may be placed on a property."  The restrictions continue in Section 6.6 which states: "**Section 6.6 Compensation From Participating Brokers Only.**  Compensation may only be offered by Broker Members of the WMAR MLS.  Any source of compensation, other than from a Broker Member, is strictly prohibited.  Any offer of compensation, other than that approved, shall result in immediate removal of the listing from the Service and the Participant shall be assessed a fine per the Rate & Fee Schedule.  (Adopted 07/16)".  The penalties for violating these rules are severe.  Section 8.1 states: "**Section 8.1 Authority to Impose Discipline….**The MLS, may, through the administrative and hearing procedures established in these rules, impose disciplne for violations of the rules and other MLS governance provisions.  Discipline that may be impsed may only consist of one or more of the following:
a.  Letter of warning;
b.  Letter of reprimand;
c.  Attendance at MLS orientation or other appropriate courses or semenars…
d.  Appropriate, reasonable fine not to exceed $15,000;
e.  Suspension of MLS rights, privileges, and services for not less than thirty (30) days nor more than (1) year;
f.  Termination of MLS rights, privileges, and services with no right to reapply for a specified period not to exceed three (3) years.  (Adopted 07/16)". (The note under this section also includes probation for up to a year).

Section 10.2 states: "**Section 10.2 Complaints of Unethical Conduct.**  All complaints of unethical conduct shall be directed to (AAR) for appropriate action in accordance with the Professional Standards Procedures established in the Association's Bylaws.  (Amended 05/08)".

1     homes that are for sale which reduces the exposure and accessibility of the home

2     and the likelihood of the broker or agent being able to sell the home on behalf of

3     the seller.[6]

4   18. More recently, the Defendant(s) through an AR ethics hearing panel attempted to

5     sanction the Plaintiffs through an ethics hearing panel.  The Plaintiffs did not even

6     represent the party that brought the action before the panel and the the Plaintiff's

7     client filed no grievance with this panel.  The panel even tried to dictate the

8     contractual forms used in this transaction and coerce Plaintiffs into using these

9     forms in the future.  On information and belief, the Defendants never represented

10

11

---

[6] The MLS Rules in Section 16.0 state: "**Section 16.0 Authority.** The (MLS) shall maintain for the use of its Members a common, MLS-approved Keysafe system which shall be operated and/or endorsed by (WMAR) subject to the bylaws of (WMAR)…MLS-approved keysafes shall be governed by the following:

  (a) (WMAR) requires placement of an MLS-approved keysafe on listed properties if any device giving access to real estate professionals…is authorized by the seller and occupant and is placed on the property.
  (b) (WMAR) MLS-approved keysafes and devices must receive MLS approval in advance of placement or use on listed properties.
  (c) …..

  (d) (WMAR) may revoke the approval of any MLS-approved keysafe or device and/or subject the Participant to discipline if the keysafe or device is used in a manner that fails to continue to satisfy these requirements.
  (e) Fines per the Rate & Fee Schedule, per listing, will be assessed for violation of Keysafe System Rules.  Each Firm/Brokerage will be granted one warning before fine(s) are assessed for subsequent violations."

Section 16.3 states: **Section 16.3 Programer Devices and Keysafes.** …The Supra Keysafe and Programer Key System shall be the Keysafe system authorized for use by members of (WMAR)."

Section 16.4 states: **Section 16.4 Responsibilities.** …Any time a fine is issued to a keyholder…[i]f the keyholder has not paid the fine within ten (10) days of notice, the programmer device shall be deactivated until the fine is paid in full.
  (a) The MLS Member…shall sign a written agreement between Supra and the keyholder stipulating the responsibilities and liabilities of the parties to the agreement.  Any breach of this agreement shall be considered a violation of these rules and regulations."

Section 16.6 states: **Section 16.6 Sharing of Programmer Keys/Devices or Codes.**  The use of a programmer device by any person other than the registered keyholder is expressly prohibited…Violations of this section shall result in a fine to the registered keyholder per the Rate and Fee Schedule, level two fine (currently $500)."

the Plaintiff and certainly did not in this transaction.  The Defendants attempted to sanction the Plaintiffs with a $1000.00 fine and a $300.00 administrative fee for the hearing.  The Plaintiffs appealed this decision and the matter was remanded for another hearing scheduled on December 14, 2021.

19. The Plaintiffs intend to seek injunctive relief prior to this hearing due to the Defendants having no right to interfere with the contractual relatioships between the Plaintiffs and their clients. (The relevant documents will be disclosed at a later date once injunctive relief is granted.  Currently, Exhibit 7 is reserved for these documents).

### RELEVANT LAW

### SUBJECT MATTER JURISDICTION

20. In Louisville & N.R. Co. v. Mottley 211 U.S. 149 (1908) the United States Supreme Court ruled on an appeal from the Circuit Court regarding subject matter jurisdiction. The case was filed in Federal Court with no Constitutional cause of action raised but it was likely going to be raised as a defense.  There was no diversity of citizenship but neither party questioned jurisdiction. The Circuit Court ruled in favor of the Plaintiffs and the Defendants appealed. (Mottley at 151).

21. The high Court refused to address the issues in the case because the lower Court, and even The United States Supreme Court, lacked jurisdiction.  The high Court stated:

"We do not deem it necessary, however, to consider either of these questions, because it is our opinion, the court below was without jurisdiction of the cause…it is the duty of this court to see to it that the jurisdiction of the circuit court, which is defined and limited by statute is not exceeded.  This duty we have frequently performed on our own motion." (Mottley at 152).

22. In layman's terms, this means that even the highest Court in our county could not rule on the matter(s) before the Court even if one party (or the other) was wrong.

23. The United States Supreme Court reversed the judgment for the Plaintiff and remanded the case back to the Circuit Court to be dismissed for lack of jurisdiction. (Mottley at 154).  If the highest Court in our country must stand down when there is no subject matter jurisdiction, certainly the Defendants in this case must do the same under these circumstances.

24. Under Arizona law, it is clear that the Arizona Department of Real Estate has jurisdiction over real estate brokers and agents.  A.R.S. 32-2102 states:

"This chapter (real estate) (emphasis added) shall be administered by the state real estate department under the direction of the real estate commissioner.  The purpose of the department in administering this chapter is to protect the public interest through licensure and regulation of the real estate profession in this state."

25. Further, A.R.S 32-2107(A) states:

"The commissioner shall have charge of the department with power to administer it in accordance with the provisions of and to carry out the purposes of this chapter."

26. Lastly, A.R.S. 32-2108(A) states:

"The commissioner…shall, investigate the actions of any natural person or entity engaged in the business or acting in the capacity of a broker (or) salesperson."

27. The Defendants have been given no power by the state legislature or the real estate commissioner to oversee any real estate matters.  Thus, they have no power to do so under any circumstance.

## ANTITRUST LAWS

28. The Defendant's continued actions violate Arizona state antitrust laws. A.R.S. 44-1402 states:

"A contract, combination or conspiracy between two or more persons in restraint of , or to monopolize, trade or commerce, any part which is within this state is unlawful."

29. A.R.S. 44-1403 further states:

"The establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competion or controlling, fixing or maintaining prices is unlawful."

30. The Defendant's actions also violate federal antitrust laws including  the Sherman Act.  15 U.S. Code § 1 states:

"Every contract, …, or conspiracy in the restraint of trade or commerce among the several states, or with foreign nations, is declared illegal.  Every person who shall make any contract or engage in any combination conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine, not exceeding $100,000,000 if a corporation or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years or by both said punishments in the discretion of the court."

31. 15 U.S. Code § 15(a) further states:

"…[A]ny person who shall be injured in his business or property by any reason of anything forbidden in the antitrust laws may sue therefor in any district court…and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.  The court may award…simple interest on actual damages for the period beginning on the date of service".

32. Here, the Defendants restricted commerce and excluded competition by unlawfully and systematically redacting and excluding information in the Plaintiff's advertisements and limiting access to Plaintiff's lockboxes on the homes the Plaintiffs had for sale.  As such, Defendants are liable for treble damages under this cause of action.

## FIRST AMMENDMENT

33. Generally, First Ammendment protection requires a "Government Actor"and it usually involves a state or federal statute that infringes on free speech.

34. This case is arguably a case of first impression because the "Government Actor" in this case is not employed by the government.  Like the government, the Defendants have created "statutes" that they refer to as "bylaws" or "MLS Rules".  Like the government, they impose fines and sanctions including expulsion.  This is a role that is held by statute in Arizona only to the Arizona Department of Real Estate.  Yet, the Defendants, in this case, attempt to assume this role and are "quasi-governmental". This not only effects approximately 1.4 million real estate brokers and agents, it also effects their clients that use the internet and MLSs as the primary source to obtain information about real estate in order to accomplish home ownership. (See again footnotes 1,2,5, and 6). Further, the Defendants completely

13

1   ignore Arizona law related to real estate broker and agent advertising. Arizona
2   Administrative Code R4-28-502(G) states:

3   "The designated broker shall supervise **all advertising** (emphasis added) for all real
4   estate…services.

5   35. Recently (2017), in Packingham v. North Carolina 137 S.Ct. 1730, 198 L.Ed. 2d
6   273, The United States Supreme Court unanimously struck down a North Carolina
7   statute that made it a felony for sex offenders to use the internet on sites where
8   minors might be.  This statute affected 20,000 sex offenders in North Carolina
9   (Packingham at 1734).

10  36. In this case, use of the internet affects 1.4 million real estate brokers and agents
11  and even more of their clients (again See footnote 1).  The internet is the primary
12  way MLS data is provided to clients.

13  37. The Court recognized the importance of the internet as it relates to the internet.  In
14  the majority opinion, Justice Kennedy said:

15  "This case is one of the first this Court has taken to address the relationship between the
16  First Amendment and the modern Internet. As a result, the Court must exercise extreme
17  caution before suggesting that the First Amendment provides scant protection for access
18  to vast networks in that medium."  He furthers stated "While we now may be coming to
19  the realization that the Cyber Age is a revolutution of historic proportions, we cannot
20  appreciate yet its full dimensions and vast potential to alter how we think, express
21  ourselves, and define who we want to be.  The forces and directions of the Internet are
22  so new, so protean, and so far reaching that courts must be conscious that what they say
23  today might be obsolete tomorrow."  (Packingham at 1736). "While in the past there may
24  have been difficulty in identifying the most important places (in a spatial sense) for the

14

exchange of views, today the answer is clear.  It is cyberspace – the "vast democratic

forums of the Internet" in general…" (Id. at 1735 citing Reno v. American Civil Liberties

Union, 521, U.S. 844, 868, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)).

38. Justices Alito and Thomas concurred in the judgment and said:

"The Court is correct that we should be cautious in applying our free speech precedents

to the internet. Ante, at 1736.  Cyberspace is different from the physical world, and if it is

true, as the Court believes, that "we cannot appreciate yet" the full dimensions and vast

potential" of "the Cyber Age" ibid., we should proceed circumspectly, taking one step at a

time." (Packingham at 1744).

39. In light of the Defendants broad overreaching through their willingness to violate

the law and assume the role of the government through something as far reaching

as the internet, they should be held to the First Amendment standard.[7] (See also,

In the Age of Social Media, Expand the Reach of the First Amendment by David L.

Hudson Jr. written for the American Bar Association attached as Exhibit 8).

**FACTUAL ALLEGATIONS**

40. Plaintiffs re-allege the allegations contained in Paragraphs 1 through 39 of Plaintiff's

Complaint.

---

[7] The Plaintiffs do not contend that the First Amendment standard should be applied in all matters when the private sector injects itself into a quasi-governmental role.  It should be a narrow exception applied here due to the depth that the Defendants have overreached and the fact that the Plaintiffs employ the Defendants to work for the Plaintiffs and want them to provide these services uninfringed.  This employment comes through things such as office fees, internet fees and dues that are paid periodically to WMAR with portions of it being given to the other Defendants.  Proof of these document will be exhibits later in this complaint.

41. Plaintiffs entered into a contract with Defendants on or about January 1, 1999 where Plaintiffs paid Defendants to provide advertising through an MLS service and access to homes through lockboxes to enhance Plaintiffs business as a real estate agent or broker.

42. Despite anything written to the contrary, Defendants were aware that Plaintiff(s) must comply with the Arizona Department of Real Estate Rules including the rules that the broker (in this case the Plaintiff) supervises **all advertising** and that the Arizona Department of Real Estate (hereinafter ADRE) has exclusive jurisdiction over real estate matters and discipline related to real estate agents and brokers.

43. On September 8, 2015, Defendants breached this duty when Defendant, Dax R. Watson, on behalf of the Defendants sent the Plaintiffs a letter attempting to infringe on the duties the Plaintiffs have to supervise all advertising pursuant to Arizona Administrative Code R4-28-502(G).

44. As a result of this breach, Plaintiffs paid an additional $5,142.00 to another brokerage October 15, 2015. (See Letter from 1st Vice President, Bryan Anderson of WMAR dated August 24, 2015, Warning letter from Plaintiff, Grady Hillis, dated August 28, 2015, Responsive Letter from Dax R. Watson dated September 8, 2015, private copy of the listing that excluded a commission if the buyers (Peter R. Grisolano) purchased the home, and settlement statement where Peter R. Grisolano was the buyer when the property sold on October 15, 2015 and Covey Luxury Properties received $5,142.00 in commission collectively attached as Exhibit 8).[8]

---

[8] Although the Defendant's actions began years prior to the first cause of action in this case, they are beyond the statute of limitations. The causes of action will be laid out closely to chronological order. All or nearly all of the causes of

16

45. Plaintiffs re-allege the allegations contained in Paragraphs 1 through 44 of Plaintiff's Complaint.

46. Plaintiffs entered into a contract with Defendants on or about January 1, 1999 where Plaintiffs paid Defendants to provide advertising through an MLS service and access to homes through lockboxes to enhance Plaintiffs business as a real estate agent or broker.

47. Despite anything written to the contrary, Defendants were aware that Plaintiff(s) must comply with the Arizona Department of Real Estate Rules including the rules that the broker (in this case the Plaintiff) supervises **all advertising** and that the Arizona Department of Real Estate (hereinafter ADRE) has exclusive jurisdiction over real estate matters and discipline related to real estate agents and brokers.

48. On September 8, 2015, Defendants breached this duty when Defendants redacted information out of Plaintiffs listing #202916, causing Plaintiffs to lose potential buyers causing a loss of incom and infringing on the duties the Plaintiffs have to supervise all advertising pursuant to Arizona Administrative Code R4-28-502(G).

---

action would have included breach of contract, antitrust violations, First Amendment violations and Tortious Interference with a Contractual Relationship violations. These causes of action will be applied when appropriate. Nearly 6 years ago, Dax R. Watson could have been the person that set the Defendants on the right path to complying with the law. Instead, he, and his firm, have been the catalyst that continues to further the actions that have lead to this complaint.

49. Pursuant to the contract dated July 16, 2019, Plaintiff was to loan Defendants $25,000.00.

50. Pursuant to the contract, Defendants were to pay 15% interest to Plaintiffs.

51. Defendants were to pay interest only for six (6) months.

52. Defendants were to pay a balloon payment of $25,000.00 at the conclusion of the six (6) months.

53. Defendants have breached the contract.

54. Defendants have failed to make any payments.

55. Plaintiffs and Defendants entered into a separate contract.

56. Defendants were to construct a residence for Plaintiffs pursuant to the separate agreement.

57. Defendants have breached the separate contract.

58. Defendants have failed to fully construct the residence for Plaintiffs.

59. Defendants RLI Insurance Company issued a statutory license bond, Bond No. RSB163647, on behalf of Defendant Creative Development.

60. Upon issuing the statutory license bond number RSB163647, Defendant RLI Insurance Company took on the responsibility of covering any damage resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.

61. Defendants Creative Development, LLC and William Haltom engaged in negligence, malfeasance, and/or substandard workmanship. Therefore, Defendant RLI Insurance Company is responsible for making Plaintiffs whole.

62. Plaintiffs must name the insurance company which issued the bond to get relief from the bond company.

63. Upon information and belief, Defendant RLI Underwriting Services, Inc. underwrote the policy and bond issued by RLI Insurance Company.  Upon underwriting the bond issued by RLI Insurance, Defendant RLI Underwriting Services, Inc. took on the responsibility of covering any damages resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.  Therefore, Defendant RLI Underwriting Services, Inc. is responsible for making Plaintiffs whole.

64. Plaintiffs must name the insurance company which issued the bond to get relief from the bond company, including the underwriter.

65. As a result of Defendants' breach, Plaintiffs have suffered damages.

<u>**COUNT 1**</u>

<u>**BREACH OF CONTRACT**</u>

66. Plaintiffs re-allege the allegations contained in Paragraphs 1 through 65 of Plaintiff's Complaint.

67. On or about July 16, 2019, Plaintiffs entered into a contract with Defendants for the construction of a home for Plaintiffs.

68. A valid and enforceable contract exists between Plaintiffs and Defendants.

69. Defendants had an obligation to deliver a fully constructed home pursuant to the contract entered into by Plaintiffs and Defendants.

70. Defendants failed to perform their end of the contract's bargain when they failed to deliver a fully constructed home pursuant to the agreement entered into by the Plaintiffs and Defendants.

71. Defendants breached the agreement.

72. Defendants breached the agreement when they failed to provide proper workmanship and construction services, including but not limited to, construction services requested by Plaintiffs and pursuant to the agreement.

73. Defendants breached the agreement when they failed to finish the construction of the residence pursuant to the agreement.

74. Defendants breached the agreement when they failed to construct a residence for Plaintiffs.

75. Defendants RLI Insurance Company issued a statutory license bond, Bond No. RSB163647, on behalf of Defendant Creative Development.

76. Upon issuing the statutory license bond number RSB163647, Defendant RLI Insurance Company took on the responsibility of covering any damage resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.

77. Defendants Creative Development, LLC and William Haltom engaged in negligence, malfeasance, and/or substandard workmanship. Therefore, Defendant RLI Insurance Company is responsible for making Plaintiffs whole.

78. Plaintiffs must name the insurance company which issued the bond to get relief from the bond company.

79. Upon information and belief, Defendant RLI Underwriting Services, Inc. underwrote the policy and bond issued by RLI Insurance Company.  Upon underwriting the

bond issued by RLI Insurance, Defendant RLI Underwriting Services, Inc. took on the responsibility of covering any damages resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.  Therefore, Defendant RLI Underwriting Services, Inc. is responsible for making Plaintiffs whole.

80. Plaintiffs must name the insurance company which issued the bond to get relief from the bond company, including the underwriter.

81. As a direct and proximate result of Defendants' breach of contract, Plaintiffs have suffered damages in an amount to be proven at trial.

82. As this cause of action arises out of contract, Plaintiffs are entitled to their reasonable attorney's fees and costs, together with interest thereon at the legal rate per annum, accrued and accruing, from date of judgment until paid in full in accordance with A.R.S. §§ 12-341 and 12.341.01.

**WHEREFORE,** Plaintiffs pray for judgment as follows:

A.      For damages in an amount to be proven at trial;

B.      For interest on any judgment due and owing to Plaintiffs at the legal rate per annum, accrued and accruing, from date of judgment until paid in full as provided under Arizona law;

C.      For Plaintiffs' reasonable attorney's fees and costs, together with interest thereon at the legal per annum, accrued and accruing, from date of judgment until paid in full in accordance with A.R.S. §§ 12-341 and 12.341.01; and

D.      For such other and further relief as the Court deems be just and proper in the circumstances.

## COUNT 2

## BREACH OF CONTRACT

83. Plaintiffs re-allege the allegations contained in Paragraphs 1 through 82 of Plaintiff's Complaint.

84. On or about July 16, 2019, Plaintiffs entered into a separate contract with Plaintiffs lending $25,000.00 to Defendants.

85. A valid and enforceable contract exists between Plaintiffs and Defendants.

86. Defendants had an obligation to pay 15% interest only to Plaintiffs for the loan made by Plaintiffs.

87. Defendants were to pay off the loan within six (6) months from July 16, 2019.

88. Defendants failed to perform their end of the contract's bargain when they failed to pay any interest on the loan.

89. Defendants breached the agreement.

90. Defendants breached the agreement when they failed to pay the loan made by Plaintiffs.

91. Defendants RLI Insurance Company issued a statutory license bond, Bond No. RSB163647, on behalf of Defendant Creative Development.

92. Upon issuing the statutory license bond number RSB163647, Defendant RLI Insurance Company took on the responsibility of covering any damage resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.

93. Defendants Creative Development, LLC and William Haltom engaged in negligence, malfeasance, and/or substandard workmanship. Therefore, Defendant RLI Insurance Company is responsible for making Plaintiffs whole.

94. Plaintiffs must name the insurance company which issued the bond to get relief from the bond company.

95. Upon information and belief, Defendant RLI Underwriting Services, Inc. underwrote the policy and bond issued by RLI Insurance Company.  Upon underwriting the bond issued by RLI Insurance, Defendant RLI Underwriting Services, Inc. took on the responsibility of covering any damages resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.  Therefore, Defendant RLI Underwriting Services, Inc. is responsible for making Plaintiffs whole.

96. Plaintiffs must name the insurance company which issued the bond to get relief from the bond company, including the underwriter.

97. As a direct and proximate result of Defendants' breach of contract, Plaintiffs have suffered damages in an amount to be proven at trial.

98. As this cause of action arises out of contract, Plaintiffs are entitled to their reasonable attorney's fees and costs, together with interest thereon at the legal rate per annum, accrued and accruing, from date of judgment until paid in full in accordance with A.R.S. §§ 12-341 and 12.341.01.

   **WHEREFORE,** Plaintiffs pray for judgment as follows:

   A.      For damages in an amount to be proven at trial;

   B.      For interest on any judgment due and owing to Plaintiffs at the legal rate per annum, accrued and accruing, from date of judgment until paid in full as provided under Arizona law;

C.     For Plaintiffs' reasonable attorney's fees and costs, together with interest thereon at the legal per annum, accrued and accruing, from date of judgment until paid in full in accordance with A.R.S. §§ 12-341 and 12.341.01; and

D.     For such other and further relief as the Court deems be just and proper in the circumstances.

## COUNT 4

## UNJUST ENRICHMENT

**99.** Plaintiffs hereby re-allege the allegations set forth in Paragraphs 1 through 98 of this Complaint as though fully set forth herein.

**100.**     On or about July 16, 2019, Plaintiffs entered into two separate contracts with Plaintiffs lending $25,000.00 to Defendants and Defendants were to construct a residence for Plaintiffs.

**101.**     A valid and enforceable contract exists between Plaintiffs and Defendants.

**102.**     Defendants had an obligation to pay 15% interest only to Plaintiffs for the loan made by Plaintiffs.

**103.**     Defendants were to pay off the loan within six (6) months from July 16, 2019.

**104.**     Defendants failed to perform their end of the contract's bargain when they failed to pay any interest on the loan.

**105.**     Defendants breached the agreement.

**106.**     Defendants breached the agreement when they failed to pay the loan made by Plaintiffs.

**107.** Defendants breached the agreement when they failed to construct a residence for Plaintiffs.

**108.** Plaintiffs have incurred attorneys' fees as a direct and proximate result of Defendants' breach of contract and unjust enrichment.

**109.** Defendants RLI Insurance Company issued a statutory license bond, Bond No. RSB163647, on behalf of Defendant Creative Development.

**110.** Upon issuing the statutory license bond number RSB163647, Defendant RLI Insurance Company took on the responsibility of covering any damage resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.

**111.** Defendants Creative Development, LLC and William Haltom engaged in negligence, malfeasance, and/or substandard workmanship. Therefore, Defendant RLI Insurance Company is responsible for making Plaintiffs whole.

**112.** Plaintiffs must name the insurance company which issued the bond to get relief from the bond company.

**113.** Upon information and belief, Defendant RLI Underwriting Services, Inc. underwrote the policy and bond issued by RLI Insurance Company.  Upon underwriting the bond issued by RLI Insurance, Defendant RLI Underwriting Services, Inc. took on the responsibility of covering any damages resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.  Therefore, Defendant RLI Underwriting Services, Inc. is responsible for making Plaintiffs whole.

**114.** Plaintiffs must name the insurance company which issued the bond to get relief from the bond company, including the underwriter.

**115.**      As a direct and proximate result of Defendants' breach of contract, Plaintiffs have suffered damages in an amount to be proven at trial.

**116.**      As this cause of action arises out of contract, Plaintiffs are entitled to their reasonable attorney's fees and costs, together with interest thereon at the legal rate per annum, accrued and accruing, from date of judgment until paid in full in accordance with A.R.S. §§ 12-341 and 12.341.01.

**WHEREFORE,** Plaintiffs pray for judgment as follows:

A.      For damages in an amount to be proven at trial;

B.      For interest on any judgment due and owing to Plaintiffs at the legal rate per annum, accrued and accruing, from date of judgment until paid in full as provided under Arizona law;

C.      For Plaintiffs' reasonable attorney's fees and costs, together with interest thereon at the legal rate per annum, accrued and accruing, from date of judgment until paid in full in accordance with A.R.S. §§ 12-341 and 12.341.01; and

D.      For such other and further relief as the Court deems be just and proper in the circumstances.

## COUNT 5

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

117.      Plaintiffs hereby re-allege the allegations set forth in Paragraphs 1 through 116 of this Complaint as though fully set forth herein.

118.          .      A valid and enforceable contract exists between Plaintiffs and Defendants.

119.     The contract between Plaintiffs and Defendants contained an implied covenant of good faith and fair dealing.

120.     Pursuant to said implied covenant of good faith and fair dealing, a duty was imposed upon Defendants to act in a way which is honest and faithful to the purpose of the agreement.

121.     Defendants breached their duty of the implied covenant of good faith and fair dealing.

122.     Defendants RLI Insurance Company issued a statutory license bond, Bond No. RSB163647, on behalf of Defendant Creative Development.

123.     Upon issuing the statutory license bond number RSB163647, Defendant RLI Insurance Company took on the responsibility of covering any damage resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.

124.     Defendants Creative Development, LLC and William Haltom engaged in negligence, malfeasance, and/or substandard workmanship. Therefore, Defendant RLI Insurance Company is responsible for making Plaintiffs whole.

125.     Plaintiffs must name the insurance company which issued the bond to get relief from the bond company.

126.     Upon information and belief, Defendant RLI Underwriting Services, Inc. underwrote the policy and bond issued by RLI Insurance Company.  Upon underwriting the bond issued by RLI Insurance, Defendant RLI Underwriting Services, Inc. took on the responsibility of covering any damages resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence,

1    malfeasance, and/or substandard workmanship.  Therefore, Defendant RLI

2    Underwriting Services, Inc. is responsible for making Plaintiffs whole.

3    127.    Plaintiffs must name the insurance company which issued the bond to get

4    relief from the bond company, including the underwriter.

5    128.    As a direct and proximate result of Defendants' breach of the implied

6    covenant of good faith and fair dealing, Plaintiffs were damaged in an amount to

7    be proven at trial.

8    129.    As this cause of action arises out of contract, Plaintiffs are entitled to their

9    reasonable attorney's fees and costs, together with interest thereon at the legal

10   rate per annum, accrued and accruing, from date of judgment until paid in full in

11   accordance with A.R.S. §§ 12-341 and 12.341.01.

12   **WHEREFORE,** Plaintiffs pray for judgment as follows:

13   B.    For damages in an amount to be proven at trial;

14   B.    For interest on any judgment due and owing to Plaintiffs at the legal rate

15   per annum, accrued and accruing, from date of judgment until paid in full as provided

16   under Arizona law;

17   C.    For Plaintiffs' reasonable attorney's fees and costs, together with interest

18   thereon at the legal rate per annum, accrued and accruing, from date of judgment until

19   paid in full in accordance with A.R.S. §§ 12-341 and 12.341.01; and

20   D.    For such other and further relief as the Court deems be just and proper in

21   the circumstances.

22

23

24

## **COUNT 6**

### **BREACH OF IMPLIED WARRANTY**

130.     Plaintiffs hereby re-allege the allegations set forth in Paragraphs 1 through 129 of this Complaint as though fully set forth herein.

131.     A valid and enforceable contract exists between Plaintiffs and Defendants.

132.     The contract between Plaintiffs and Defendants contained an implied warranty.

133.     Pursuant to said implied warranty, a duty was imposed upon Defendants to deliver a safe, habitable, and quality building to Plaintiffs.

134.     Defendants breached their duty of the implied warranty.

135.     Defendants RLI Insurance Company issued a statutory license bond, Bond No. RSB163647, on behalf of Defendant Creative Development.

136.     Upon issuing the statutory license bond number RSB163647, Defendant RLI Insurance Company took on the responsibility of covering any damage resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.

137.     Defendants Creative Development, LLC and William Haltom engaged in negligence, malfeasance, and/or substandard workmanship. Therefore, Defendant RLI Insurance Company is responsible for making Plaintiffs whole.

138.     Plaintiffs must name the insurance company which issued the bond to get relief from the bond company.

139.     Upon information and belief, Defendant RLI Underwriting Services, Inc. underwrote the policy and bond issued by RLI Insurance Company.  Upon underwriting the bond issued by RLI Insurance, Defendant RLI Underwriting

Services, Inc. took on the responsibility of covering any damages resulting from Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.  Therefore, Defendant RLI Underwriting Services, Inc. is responsible for making Plaintiffs whole.

140.     Plaintiffs must name the insurance company which issued the bond to get relief from the bond company, including the underwriter.

141.     As a direct and proximate result of Defendants' breach of the implied warranty, Plaintiffs were damaged in an amount to be proven at trial.

142.     As this cause of action arises out of contract, Plaintiffs are entitled to their reasonable attorney's fees and costs, together with interest thereon at the legal rate per annum, accrued and accruing, from date of judgment until paid in full in accordance with A.R.S. §§ 12-341 and 12.341.01.

**WHEREFORE,** Plaintiffs pray for judgment as follows:

C.     For damages in an amount to be proven at trial;

B.     For interest on any judgment due and owing to Plaintiffs at the legal rate per annum, accrued and accruing, from date of judgment until paid in full as provided under Arizona law;

C.     For Plaintiffs' reasonable attorney's fees and costs, together with interest thereon at the legal rate per annum, accrued and accruing, from date of judgment until paid in full in accordance with A.R.S. §§ 12-341 and 12.341.01; and

D.     For such other and further relief as the Court deems be just and proper in the circumstances.

1

## **COUNT 7**

2

## **NEGLIGENCE**

3   143.   Plaintiffs hereby re-allege the allegations set forth in Paragraphs 1 through

4       142 of this Complaint as though fully set forth herein.

5   144.   A valid and enforceable contract exists between Plaintiffs and Defendants.

6   145.   The contract between Plaintiffs and Defendants called for Defendants to

7       construct Plaintiffs' house free of negligence.

8   146.   Defendants acted negligently when it failed to perform their duties as a

9       reasonable construction builder would perform its duties under the circumstances.

10  147.   Defendants RLI Insurance Company issued a statutory license bond,

11      Bond No. RSB163647, on behalf of Defendant Creative Development.

12  148.   Upon issuing the statutory license bond number RSB163647, Defendant

13      RLI Insurance Company took on the responsibility of covering any damage

14      resulting from Defendants' Creative Development, LLC'S and William Haltom's

15      negligence, malfeasance, and/or substandard workmanship.

16  149.   Defendants Creative Development, LLC and William Haltom engaged in

17      negligence, malfeasance, and/or substandard workmanship. Therefore,

18      Defendant RLI Insurance Company is responsible for making Plaintiffs whole.

19  150.   Plaintiffs must name the insurance company which issued the bond to get

20      relief from the bond company.

21  151.   Upon information and belief, Defendant RLI Underwriting Services, Inc.

22      underwrote the policy and bond issued by RLI Insurance Company.  Upon

23      underwriting the bond issued by RLI Insurance, Defendant RLI Underwriting

24      Services, Inc. took on the responsibility of covering any damages resulting from

Defendants' Creative Development, LLC'S and William Haltom's negligence, malfeasance, and/or substandard workmanship.  Therefore, Defendant RLI Underwriting Services, Inc. is responsible for making Plaintiffs whole.

152.     Plaintiffs must name the insurance company which issued the bond to get relief from the bond company, including the underwriter.

153.     As a direct and proximate result of Defendants' breach of the implied warranty, Plaintiffs were damaged in an amount to be proven at trial.

154.     As this cause of action arises out of contract, Plaintiffs are entitled to their reasonable attorney's fees and costs, together with interest thereon at the legal rate per annum, accrued and accruing, from date of judgment until paid in full in accordance with A.R.S. §§ 12-341 and 12.341.01.

**WHEREFORE,** Plaintiffs pray for judgment as follows:

D.     For damages in an amount to be proven at trial;

B.     For interest on any judgment due and owing to Plaintiffs at the legal rate per annum, accrued and accruing, from date of judgment until paid in full as provided under Arizona law;

C.     For Plaintiffs' reasonable attorney's fees and costs, together with interest thereon at the legal rate per annum, accrued and accruing, from date of judgment until paid in full in accordance with A.R.S. §§ 12-341 and 12.341.01; and

D.     For such other and further relief as the Court deems be just and proper in the circumstances.

//

//

//

**RESPECTFULLY SUBMITTED**  this 6th day of September, 2021.

**CORONADO LAW FIRM, P.L.L.C.**


/s/ Eduardo H. Coronado
Eduardo H. Coronado, Esq.
Attorneys for Plaintiffs